Von DeVeld et al., Appellants, v. Judy et al.

Division Two, March 15, 1898.*

1. **Will:** MENTAL INCAPACITY: EVIDENCE. The compentency of a testator to make a will is to be decided by the state of his mind *at the time* the will was made, and to shed light on its condition *then* evidence showing the condition of his mind long prior to, and closely approaching, and shortly subsequent to its execution, is competent, but such evidence should be admitted for no other purpose.

2. ———: ———: ———: AT TIME OF EXECUTION. And so where the evidence clearly shows that testator, who was eighty-three years old, was unquestionably of sound and disposing mind at the very time and on the particular day his will was drawn up and executed, the will will be upheld, although some of the evidence indicated a prior imbecility produced by the violence of disease and the inordinate use of drugs to alleviate pain, coupled with the increasing infirmities and feebleness of old age; for from such temporary aberration, even if clearly established, no presumption of *continuity* would flow. Besides, in this case, the evidence shows that for some time prior to the day the will was executed, testator had not used the drug, and on that day manifested the mental aptitude for business and the indomitable will which had through life been his wonted characteristics.

3. ———: ———: ———: CONTINUITY OF PRIOR IMBECILITY: BURDEN OF PROOF. However, if the evidence shows chronic imbecility of the testator prior to the making of the will, then continuity of such imbecility will be presumed, and the burden of proving an interval of competency or a "lucid interval" will rest on proponents.

4. ———: PRACTICE: ERRONEOUS INSTRUCTIONS DISREGARDED. In a will contest, where the verdict is clearly for the right party, it is wholly immaterial if error occurs in the instructions.

5. ———: COMPETENCY: CONTRACT. One may have capacity to make a will, and not be competent to make a contract. And hence an offer to show that a proponent had admitted that the testator was not "competent to do business," was properly refused.

*Appeal from Cass Circuit Court.*—HON. JAMES H. LAY, Judge.

AFFIRMED.

*NOTE.—Decided December 7, 1897; motion for rehearing filed, and denied March 15, 1898.

*Kinley, Carskadon & Kinley* and *Noah M. Givan* for appellants.

(1) The court erred in refusing to allow witnesses, expert and non-expert, to testify and give opinions as to testator's mental condition. Those who are acquainted with the testator at the time of his making the will, saw him act, heard him talk, and were acquainted with his mental condition, may give their opinion as to whether or not he had sufficient mental capacity to make a will. This is *a fortiori*, true of experts. *Brown v. Mitchell*, 26 S. W. Rep. (Tex.), 1059; *Newcome v. Newcome*, 27 S. W. Rep. (Ky.), 997; *Overall v. Bland*, 12 S. W. Rep. (Ky.), 273; *Appleby v. Brock*, 76 Mo. 317; *Baldwin v. State*, 12 Mo. 223; *Moore v. Moore*, 67 Mo. 192; *Sharp v. Railroad*, 114 Mo. 100. (2) The court erred in such a way as to mislead the jury, in allowing witnesses Sloan, Martin, and Smith to give their opinion that testator understood the lease, power of attorney, contract and mortgages mentioned by them respectively. *King v. Railroad*, 98 Mo. 235; *State v. Miller*, 44 Mo. App. 159; *Pugh v. Ayers*, 47 Mo. App. 590; *Nelson Mfg. Co. v. Mitchell*, 38 Mo. App. 321. (3) The court erred to the prejudice of plaintiffs in the trial of the case in refusing to allow Mrs. Von de Veld to state the general tenor of testator's talk in regard to plaintiff, Mrs. Arnett, and in refusing to allow witness, J. C. Smith, to state what he saw Mrs. Arnett doing with regard to testator's business affairs, etc., and in allowing Mr. Burney for defendants to testify to testator's statements of threats to break the will, alleged to have been made by Mr. Von de Veld. the latter as immaterial to the issues in the case, and all as prejudicial to plaintiffs, and in conflict with other rulings of the court favorable to defendants. (4) The instructions given

by the court fail to intelligently define testamentary capacity, or capacity to make a will. The partial definition attempted in plaintiffs' instructions is a negative rather than an affirmative one. A negative definition is no definition. *Farmer v. Farmer*, 129 Mo. 535; *Couch v. Gentry*, 113 Mo. 255; *Carl v. Gobel*, 120 Mo. 291; *Norton v. Paxton*, 110 Mo. 465; *Myers v. Hauger*, 98 Mo. 429; *Benoist v. Murrin*, 58 Mo. 308; *Meeker v. Meeker*, 7 Iowa, 352; *Railroad v. Stock Yards*, 120 Mo. 559. (5) The giving of conflicting and contradictory instructions furnishes no guide to the jury. The error of some is not cured by others that are correct. The jury can not determine which is correct. The instructions for plaintiffs and defendants are irreconcilably conflicting. *Bluedorn v. Railroad*, 108 Mo. 450; *State v. Cable*, 117 Mo. 380; *Spillane v. Railroad*, 111 Mo. 555; *Hickman v. Link*, 116 Mo. 123; *Stevenson v. Hancock*, 72 Mo. 612; *Shreiner v. Shreiner*, 35 Atl. Rep. (Pa.) 974. It was error to instruct the jury that they "have nothing to do with the equity or inequity of the testamentary disposition of property," and that "it is immaterial to the issues in this case whether the paper read in evidence as the will of R. S. Judy disposes of, or purports to dispose of, the whole estate or not." Said instructions single out particular facts, and direct the attention of the jury to them, and are argumentative, misleading and improper. *New Albany Woolen Mills v. Myers*, 43 Mo. App. 124; *Henry v. Hall*, 17 So. Rep. (Ala.), 187; *Carl v. Gobel*, 120 Mo. 283; *Knox v. Knox*, 95 Ala. 495; *Clark v. Fisher*, 1 Paige, 171; 1 Redfield on Wills, 516; *Newcome v. Newcome*, 27 S. W. Rep. (Ky.) 997; *Norton v. Paxton*, 110 Mo. 465. (7) The provisions of the will disposing of property, disinheriting heirs, or making inequitable and unjust distribution of property, should all be considered by the jury, together with all the provisions of

the will and the condition of the objects of bounty, and all other facts and circumstances in evidence, in determining the mental capacity of the testator, and it is misleading and a fatal error to instruct the jury that they have nothing to do with either of these facts. It is prejudicial to the rights of parties and misleading to the jury and manifest error to allow testimony in regard to these matters to go to the jury, and then instruct them that they have nothing to do with them. *Young v. Ridenbaugh*, 67 Mo. 586; *Hammon v. Dyke*, 42 Minn. 273; *Couch v. Couch*, 7 Ala. 519; *Higgins v. Carleton*, 28 Md. 115; *Railroad v. Stock Yards*, 120 Mo. 559. (8) The terms, "mentally capable of making a will," and "mental capacity to make a will," and competent to make his will," and "testamentary disposition of property," and he may even want capacity to transact many of the ordinary affairs of life and "highest qualities of mind," as used in the instructions, should have been defined and explained by the court. They are technical and unusual terms, not understood by jurors. *Wiser v. Chesley*, 53 Mo. 547; *Stanley v. Railroad*, 114 Mo. 620; *Flint Mfg. Co. v. Ball*, 43 Mo. App. 504; *State v. Heinze*, 45 Mo. App. 407; *Railroad v. Dawley*, 50 Mo. App. 480; *Morgan v. Durfee*, 69 Mo. 469; *Boogher v. Neece*, 76 Mo. 383.

*Burney & Burney* and *R. T. Railey* for respondents.

(1) Plaintiffs did not ask Finter whether Judy could make a will or not. His answer was not only a volunteer statement and therefore incompetent and properly excluded, but even if he had been asked the question as to whether Judy had sufficient mind and memory to make a will, he should not have been permitted to answer same, for the reason that the decisions of our State do not authorize it. *Benjamin v.*

*Railroad*, 133 Mo. 289; Rogers on Expert Test. [2 Ed.], sec. 34; *Farrell's Adm'r v. Brennan's Adm'x*, 32 Mo. 328; *Kempsey v. McGinniss*, 21 Mich. 143; *May v. Beadley*, 127 Mass. 414; *Gibson v. Gibson*, 8 Yerg. 329. (2) It would likewise have been incompetent, because witness did not qualify himself to testify as an expert, nor did he show that he had the slightest knowledge as to the qualifications necessary to make a will. Witness did not see Judy the day the will was executed, and his answer would be simply an opinion upon the ultimate fact to be determined by the jury, and for that reason, clearly incompetent. (3) The opinion of an ordinary witness is only admissible when the matters described can not be reproduced in court, as they were presented to the witness. *Benjamin v. Railroad*, 133 Mo. 289. (4) The converse of the proposition is equally true that if the facts under consideration can not be presented to the jury as they appeared to witness, then the latter can express his opinion upon those matters which can not be intelligently reproduced before the court or jury. *Benjamin v. Railroad*, 133 Mo. 289; *State v. Robinson*, 117 Mo. 664; *Sharp v. Railroad*, 114 Mo. 100; *State v. Williamson*, 106 Mo. 170; *State v. Buchler*, 103 Mo. 207; *McPherson v. Railroad*, 97 Mo. 256; *State v. Parker*, 96 Mo. 393; *Gutridge v. Railroad*, 94 Mo. 472; *Appleby v. Brock*, 76 Mo. 318; *Greenwell v. Crow*, 73 Mo. 638; *Eyerman v. Sheehan*, 52 Mo. 222; *Sampson v. Railroad*, 57 Mo. App. 311; *Madden v. Railroad*, 50 Mo. App. 673. (6) But, even if it be considered an abstract proposition of law, if it states the law correctly, and no injury has been inflicted, the plaintiffs have no legal right to complain. *Benjamin v. Railroad*, 133 Mo. 290; *McGrew v. Railroad*, 109 Mo. 589. (7) It is claimed there is a conflict of instructions. There is no merit in this contention. The

plaintiffs, having invited this error, if it is one, are in no condition to complain.    *Tomlinson v. Ellison*, 104 Mo. 112; *Whitmore v. Railroad*, 100 Mo. 47; *Reilly v. Railroad*, 94 Mo. 600; *Bettes v. Magoon*, 85 Mo. 580; *Holmes v. Braidwood*, 82 Mo. 616; *Noble v. Blount*, 77 Mo. 235; *Smith v. Culligan*, 74 Mo. 387; *Bank v. Hammerslough*, 72 Mo. 274; *McGonigle v. Daugherty*, 71 Mo. 259; *Harris v. Hays*, 53 Mo. 90.    (8) The two instructions are not only entirely harmonious but no jury could have been misled by defendants' instruction numbered 3, given in connection with that numbered 1 on part of plaintiffs.    Especially is this so when under the law, all the instructions are to be construed together.    *Meadows v. Life Ins. Co.*, 129 Mo. 97; *Hughes v. Railroad*, 127 Mo. 462; *Spillane v. Railroad*, 111 Mo. 564; *Bank v. Hatch*, 98 Mo. 376; *Dougherty v. Railroad*, 97 Mo. 661; *Owens v. Railroad*, 95 Mo. 169; *Whalen v. Railroad*, 60 Mo. 323.    (9) Instruction numbered 6, given upon the part of defendants, in the first part thereof told the jury that it was immaterial to the issues in the case, whether the instrument offered in evidence as Judy's will, disposed of the whole of his estate or not.    They were then instructed that the only issue was as to whether Judy at the time of making said instrument, was competent to make a will.    This instruction is clearly the law. *Myers v. Hauger*, 98 Mo. 438; *Couch v. Gentry*, 113 Mo. 255; *Cox v. Cox*, 101 Mo. 168; 1 Woerner, sec. 228, p. 502; *Lilly v. Tobbein*, 103 Mo. 486; *Owens v. Sinklear*, 110 Mo. 57.

SHERWOOD, J.—This cause originated in a contest over the will of Resin S. Judy who died in Colorado on the twenty-first day of November, 1893, at the age of eighty-three years.    The contestants in their petition

asserted: "That at the time of its execution, the said Resin S. Judy was not of sound and disposing mind and memory, and was, by reason of his mental infirmities, incapable of devising his property." Another ground of contest was undue influence, but this, at the trial, was abandoned and expressly withdrawn. The jury found a verdict in favor of proponents.

The will in controversy was executed on the twenty-seventh day of September, 1893. A former will had been executed by Judy in the fall of 1891; it had been written by Zick, in which D. D. Farmer and A. J. Finter were named as executors. In only four respects did the present will differ from the former one. *First*, the testator in the place of the executors named in the former will, substituted those of James T. Burney and H. V. Hurst. *Second*, in the Zick will, Mrs. Belcher, a daughter of Judy's, was to receive one third of the personal property, which in the present will was reduced to one fifth. *Third*, Annie Arnett, a granddaughter of Judy's, one of the contestants, was to have received by the first will, one third of what her mother would have received, if living while, in the last, it was changed to one half. *Fourth*, in the last will, James T. Burney, who wrote the will added a paragraph construing certain bequests which had preceded this paragraph, defining the interests of Araminta Daniel deceased, John Judy deceased and Terrissa Clark deceased.

It is disclosed by the evidence that Judy had moved to Cass county in 1854. He was a farmer, was remarkable, even up to the time of his death, for his strong will power, and in disposition was decidedly contrary. He was a man of prominence in his county, having been elected sheriff of the county for two terms, and was sheriff of that county at the close of the war. In his chosen avocation he had accumulated quite a

fortune for one engaged in farming, being possessed
at the time of death of money and personal property
to the amount of about $40,000, and owned some
eight hundred acres of real estate, and town lots esti-
mated as worth $20,000. These values had, however,
for the most part, increased from small beginnings
prior to the calamitous year of 1892. His wife died in
1890, from which period up to the time of his own
decease, he lived on his old homestead farm in Big
Creek township in the north part of Cass county, with
the exception of a few months spent in boarding at
Finter's at the Mers Hotel, at Brown's, Woolridge's,
and in Colorado.

There were only two real contestants of the will,
one of these Mrs. Catherine Von de Veld, daughter of
Judy, who was only given by the will her note for
$581, held by her father, and $50, which was precisely
the provision made for her in the first will. The other
actual contestant was Mrs. Arnett, the mute, grand-
daughter of Judy, whose portion, as already mentoned,
had been increased by the last will from one third to
one half. Judy had been very sick on several occasions
from 1888 to 1890 and subsequently, but no question
is raised as to his capacity to execute the will drawn by
Zick in 1891. The record does not disclose a single
instance where, in making a contract or trade, Judy
was not fully able to hold his own against anyone.
Owing to Judy's age and feebleness and consequent
inability to get about, for some five years he had been
compelled to employ an agent to attend to his business,
as he had notes owing to him in six or eight townships,
and he also owned land in four or five townships,
First, one Walden was employed as agent, but in con-
sequence of Judy's falling out and having litigation
with him, Finter was employed, and as Judy was mak-
ing preparations to go to Colorado, where he had

previously been on a visit, and where he had a daughter living, Mrs. Belcher, he was desirous of having a settlement with Finter before his departure. Accordingly, he told Burney about the twenty-fourth or twenty-fifth of September that he wished him to assist in making the settlement with Finter. This Burney did, going with Judy to Pleasant Hill to do so on the twenty-sixth of September, on which date and at which place the settlement was made with Finter, Judy assisting Burney in going over items, figures, etc., involved in that settlement, and seemed to understand the matters, and as far as Burney could see, did understand them. When speaking of wanting to take his business out of Finter's hands a day or two before the settlement was made, Judy remarked to Burney: "I think Finter is an honest man, but there is no business about him." "He was very emphatic about that," Burney says. Upon completion of the settlement, the business was taken out of Finter's hands, by Judy, just as he said he intended to do. Among other reasons Judy gave at the time he told Burney he wished him to assist him in making a settlement with Finter, were that the latter had in his absence settled with Dr. Cundiff and paid him a large amount more than he believed he (Judy) owed him, and then Finter paid Cundiff *in cash*, when Cundiff owed Judy a note and the payment should have been by simply crediting the amount claimed by Cundiff on the note. At the time the settlement was made, at the Citizens' Bank at Pleasant Hill, a settlement which occupied about a half day, Judy also complained about a charge which Finter had made for money paid Zick, $50, which was for information furnished about a certain mortgage on certain land, which Judy said should not have been paid Zick, inasmuch as the latter had been assisting Finter in collecting the money, and had been paid for it.

At the time Judy had spoken to Burney about taking his business out of Finter's hands, etc., he also mentioned to him about wishing to make a change in his will; that he wanted to change executors; that Finter was no business man.  The next day after the settlement was made at Pleasant Hill, Judy, who had returned from that place with Burney, came down in the morning of September the twenty-seventh, sent and had his old will brought to him, and told Burney he wanted it changed.  Thereupon Judy proceeded to tell Burney the substance of it as he remembered it and how and in what respects he wanted the changes made, giving reasons therefor.  He first said he wanted the executors changed.  He mentioned no reason why he wanted D. D. Farmer displaced, but he gave as a reason why he wanted Finter displaced, that "Finter was not enough of a business man to attend to the business" (a fact which was abundantly established by the evidence, as it appeared that Finter had to employ Zick to do the business of agent for him).  Then Judy asked Burney if *he* would act as executor, and Burney replying that he would if he would name some person who was interested in the estate who would act with him.  Upon this, Judy talked about Hurst; mentioned him; asked if it was necessary to have Hurst's consent first to act, and on being told it was not, and that witness was satisfied Hurst would act, he then said if Burney would act with Hurst he would put them both in.  Hurst was not present on this occasion, nor any of the heirs of Judy. Having arranged about who should be the executors, Judy then proceeded to name his heirs; that is the children and grandchildren, and one great-grandchild, but he did not know the Christian name of the great-grandchild.  This child lived in Kansas and his mother was named Belle Judy.  Its given name was *blank* in the former will.  Judy never saw it and did not remember

its name. Judy mentioned all the heirs, including this great-grandchild, but could not remember the given name of the latter.

Witness said there were four changes made from the will written by Zick in 1891. The first was in regard to the executors as already stated. The next two changes in the old will were these: The former will gave Mrs. Belcher one hundred and sixty acres of land and one third of the personal property when divided. He changed the Zick will in this respect, so as to give Mrs. Belcher one fifth instead of one third of the personal property. He said he thought one third would be too much and one fifth would be nearer right. The third change was in regard to Mrs. Arnett, the mute. In the former will she was to receive one third of what her mother would have received. The reason for changing the will in respect to Mrs. Arnett was that she was more helpless, and needed more than any of the other grandchildren. He gave as a reason for putting Mrs. Arnett's interest in trust, that it was that way before, and said Newt. Arnett—her husband—had run through with what he had before, and he didn't want him to have charge of what Annie got. The fourth was that clause saying what is meant by what John J. Judy and Araminta Daniel and Terrissa Clark would receive as heirs, if living. That was changed so as to say what would be left after taking out the specific bequests given others before that. Leaving out this, and the other three changes heretofore mentioned, the will was the same as the one written by Zick in 1891. There was no change made in regard to Mrs. Von de Veld, nor was there any change made in the bequests to any of the other heirs, except as heretofore mentioned. He said at the time the will was written, that Von de Veld was the worst enemy and had been the worst enemy he

had ever had.   He also said to witness, "You probably
think I ought to give my daughter more anyhow," but
then said Mrs. Von de Veld took his part in it all the
way through.   Witness found the Von de Veld and
Arnett notes with the papers.   Judy told witness that he
had lost his notes, and accused Von de Veld of taking
same for the purpose of getting his will.   Judy talked
a while—quite a while—and told witness what changes
he desired made, and they were put on the margin of
the Zick will, and after they had talked thoroughly
about the matter, witness understood what Judy wanted.
The latter went away, and came back in the afternoon,
after it had been copied.   He talked over his business
in a general way at that time.   The will was then
signed by Judy, and attested by the subscribing wit-
nesses.   Judy made this request of Burney, that "noth-
ing should be known about the provisions of the will."
This being done, the recollection of Burney is that
Judy took the old will, put it into the office stove where
there were a number of waste papers, and with a match
set the papers afire.

     A list of Judy's notes was made out the following
day, after the will was executed, at the law office of
witness.   Judy was present nearly all the time, and was
looking after it, just to see how it came out, and how
much he did own.   He did not do any of the writing.
He was consulted about some things when witness and
Wooldridge did not understand it.   Among other things,
where two notes were drawn for the same amount, he
told Wooldridge, that only one was due, and the other
ought to be returned; he said it had been paid.   Judy
understood and explained questions which he was con-
sulted about.   When Judy came back from Colorado
(it was on the twenty-first of September, 1893; he went
there on August 9, 1893), he found that Mrs. Arnett
had been given some assistance by the county court,

and he felt sorry about it. It grieved him to think that a man who had been sheriff of the county, and of his standing, should have the county support his grand-child. He said he was going to fix her a house, and proposed to fix up one of his houses for her, but she didn't want to live in it. Shortly after the will was written, on two different occasions, Judy said to Bur-ney: "I understand that Von de Veld is going to try to break my will because I am crazy, and laughed." Judy then said to witness: "Which do you think is the craziest, Von de Veld or me?" Judy then laughed again.

In the latter part of October, 1893, Judy wished to see about his taxes, so he went to see Henry Smith who was the collector of Big Creek township in which he and Judy had lived for many years. He was thirty-six years old and had known Judy nearly all his life. He came in town that day after his tax books, and Judy hap-pened to meet him near the courthouse in Harrison-ville. Judy hallooed to him, and said: "Henry, I want to see you." They were then apart about the distance of the width of a street. Coming up to him, Judy told him he wanted to find out how much his taxes were in Big Creek township, and Smith told him he would look it up so soon as he attended to another mat-ter, but meanwhile Judy had gotten Maxwell to look up the matter for him; but in that conversation Judy re-marked to Smith that his taxes in the various town-ships were something over $600; that he wanted to see Dick Wooldridge (his grandson by marriage who had been appointed by Judy as his attorney in fact on the twenty-eighth of September, 1893). Judy then asked Smith to "come some Saturday *before the first of Janu-ary* and get the taxes as *he did not want to pay any pen-alty*." Judy also remarked to Smith that his taxes in the township aforesaid were higher than they had ever

been before, and this Smith says was true. Judy then went into county clerk Maxwell's office, and said he wanted to see what his taxes were; said he would make a calculation as he wanted to settle with Smith either that day or pretty soon. Maxwell then asked Judy about his land in Big Creek township, the section it was in. Whereupon Judy proceeded from memory to give the section, township and range of the land in that township. Judy also stated to Maxwell that he had some land in two other townships, Polk and Pleasant Hill, which embraced two townships and two ranges, amounting in all to about 800 acres, and Judy gave the sections, townships and ranges, and also the numbers of the lots he had in Pleasant Hill. And Maxwell on examination of the tax books, found Judy's description, based on memory alone, absolutely correct according to the books. On ascertaining the amount of his personal taxes in Big Creek township, the place of his residence, Judy said he thought his taxes were pretty high. After getting through this business, a general conversation ensued between the parties, Judy asking Maxwell how he liked these "Cleveland times." It is in evidence also, that when taxes were collected from Judy, he always knew the description of his land, and could give that description from memory.

A few days subsequent to these conversations with Smith and Maxwell, Judy made his second trip to Colorado, to wit, on the seventh day of November, 1893, reaching there on the ninth of that month a trip which he had had in contemplation for some weeks previous. These trips to Colorado were made, it seems, by Judy when alone, both going and returning; his return to Missouri occurring on the twenty-first day of September, 1893, just six days prior to the execution of the last will.

On his arrival at Mrs. Belcher's, his widowed

daughter's house, in Colorado, he wrote the following letter:

"COLORADO SPRINGS, Nov. 9th, 1893.

"*Mr. R. S. and Annie Wooldridge.*

"DEAR GRANDCHILDREN: I arrived here yesterday and found not very well but able to be up and about. I was not well yesterday myself, but as usual to-day. Everything looks bright; the elections has gone right— New York and all the principal States. You see that Dictator, 'I am Grover Cleveland' has lived to see that Wall street and him can't run the whole United States. Please, when you get this, let me hear from you. Everything come all right but my trunk and I have no clothes, see to it and oblige,

"As Ever Yours,

"R. S. JUDY."

At that place Judy died on the twenty-first day of November, 1893, aged eighty-three years. Pro and con the will, over one hundred witnesses testified in the cause. There was abundant testimony of the most cogent character, and by numerous witnesses, showing both by the facts related and the opinions of witnesses based thereon, that in every respect Judy was fully capable of holding his own in making contracts, in which it seems he invariably got the best end of the bargain, and that he was undoubtedly competent to make a will. It is true the record discloses a competition of evidence on the point whether Judy was of sufficient mental capacity to make a will, yet much of the testimony introduced by the contestants was of a character not at all calculated to favorably impress the impartial mind with a very great or abiding sense of its probative force. Of this sort was testimony to the effect that Judy was filthy in his person and habits; exposed his person before a lady; was forgetful of old friends; failing in memory; made frequent repetitions in his conversa-

tion; got lost, etc., etc.   Of all which it may be said that much of the testimony on the particular topics just mentioned, was based on remarks made, and acts done, while Judy was under the influence of fever drugs, great physical weakness arising from long continued sickness; to this feebleness incident to great age combined with the other causes mentioned, and impaired eyesight.   And as to the two or three instances where he was lost, it was shown that *he knew he was lost;* so stated, had never been to the places he was seeking but once or twice before, and as soon as the places were pointed out to him, he went at once to them.

But even if the testimony on behalf of the contestants were much stronger than it is; much stronger indeed than that of the proponents of the will, still that would not be decisive of this case, and for these reasons:   In the first place the single issue tendered by the contestants of the will was, as heretofore stated: "*That at the time of its execution,* the said Resin S. Judy was not of sound and disposing mind and memory, and was, by reason of his mental infirmities, incapable of devising his property."   On this charge, by their general denial, the proponents of the will joined issue.   Although when a charge of insanity or imbecility is made against a testator, evidence is competent to show the condition of his mind long prior to and closely approaching the time of the will's execution, as well as the condition of his mind shortly subsequent to such execution, yet the purpose of such prior and subsequent testimony is only to indicate the state of his mind *at the very time* the execution of the will took place.   That is the true time to try his mind.   The fact of competency is to be decided by the state of the testator's mind *at the time* the will was made, and although evidence is always admissible

of prior and subsequent occurrences as tending to shed light on the question of the state of his mental faculties and of his bodily health on the day of the will's execution, yet such evidence is only receivable for that purpose alone and is not otherwise to be regarded. *Saxon v. Whitaker*, 30 Ala. 237; *Harrison v. Rowan*, 3 Wash. C. C. Rep. 586, and other cases cited in that first mentioned.

The circumstances already related show with very convincing clearness that Judy when the *factum* occurred, was of sound and disposing mind and memory. As clean a bill of mental health is not ordinarily furnished in will contests as this record affords. There were no "soundings to folly" exhibited by the testator on the *all important day* upon which the contest in this case centers. The will "was a rational act, rationally done." Even Dr. Cundiff who took dinner with Judy at Woolridge's on the twenty-seventh day of September, an hour or two before the will was formally signed and attested, and seemed to be very pregnant of the theory which he pertinaciously asserted, that Judy was mentally unfit to make a will, yet he could not and did not attempt to deny that Judy spoke to him intelligently of his trip to Colorado; as to whether it had benefited him or not, and about his contemplated return to Colorado. So that the competency of Judy *on the day in question* stands conceded and unimpeached. Now, if the alleged incompetency of Judy arose from imbecility produced by the violence of disease; the inordinate use of drugs, coupled with the increasing infirmities and feebleness of age, still, there would be no presumption of continuity flowing from such temporary cause. 1 Greenl. Ev. [14 Ed.], sec. 42; 2 *Ib.*, sec. 689; *State v. Lowe*, 93 Mo. *loc. cit.* 570 *et seq.*, and cases cited. And it seems that when Judy "threw

physic to the dogs," and went unattended to Colorado and returned, he had regained, if indeed he had ever lost, that mental aptitude for business and that indomitable will which had been his wonted characteristics, and exhibited them prior to and on the very day the litigated will was made.

But if we take it that the evidence had established that prior to that day, Judy was afflicted with chronic imbecility, then continuity of such imbecility would be presumed, and the burden of proving an interval of competency, or a "lucid interval" as it is termed in cases of insanity would have rested on proponents. See above authorities.

But in this case there was abundant evidence, as heretofore noted, to establish such interval of competency on the twenty-seventh day of September, 1893, and there was, touching this *vital* and *pivotal* date, no evidence to the contrary. So that whatever burden was cast on the proponents of the will, if there was any such burden, was fully met by them by the adduction of evidence of the character stated. A very affecting instance and illustration of the power of such evidence to rehabilitate even an insane person with the attributes of mental soundness is afforded in the case of *Cartwright v. Cartwright*, 1 Phillim. Rep. 90.

There the testatrix had been afflicted in early life with mental disorder. Afterward she was supposed to be perfectly recovered, and for some years conducted an establishment of her own just as if in all respects rational. But subsequently, for several months prior to the execution of her will, her habit and condition of body, together with her manner were clearly indicative of some of the worst symptoms of insanity, and so continued after the *factum* occurred. It seems her physician had forbidden her nurses and attendants to permit her to read and write as it might disturb her

head, and this order was for some time obeyed. Becoming very clamorous however for writing materials, the physician at length permitted her to have them. So soon as she was furnished them, and her hands which had been constantly tied, were unloosed, she sat down at her bureau, desiring her nurse and servant to leave her alone while she wrote. They accordingly retired to an adjoining room from which they watched her. At first she wrote on several pieces of paper; got up in a wild and furious manner; tore the papers and committed them to the flames. After doing this, she walked up and down the room in a very disordered way for some time, and muttering to herself, wrote the will. Inquiring the day of the month, an almanac was given her and the date pointed out. Calling then for a candle to seal the paper, she was given one, which she used for that purpose, although theretofore she had not been trusted with a candle, her attendants being forced to hold it at a distance while she read the papers. One of the witnesses to the above transaction deposed that in her opinion the testatrix had not then sufficient capacity to understand what she did, and that while she was occupied in writing the instrument upwards of an hour, she exhibited both in manner and gestures many indications of insanity. The will, however, being written in a remarkably fair hand, without blot or mistake, being a proper and natural will, conforming to what her affections were shown to be at that time, and her executors and trustees very discreetly appointed. Two months thereafter, in a conversation with the mother of the parties named as beneficiaries in the instrument, the testatrix mentioned the making of the will, ordered her servant to bring it, and then delivered it to the mother, remarking that it needed no witnesses, since the estate was all personal. This instrument was pro-

nounced to be the legal will of the testatrix. This sentence was affirmed on appeal. The eminent judge, SIR WILLIAM WYNNE, who delivered the opinion in the court of first instance, after remarking that the court did not depend on the opinions of the witnesses, but on the facts to which they deposed, observed: "The strongest and best proof that can arise as to a lucid interval is that which arises from the act itself of making the will. That I look upon as the thing to be first examined, and if it can be proved and established that it is a rational act rationally done, the whole case is proved. What can you do more to establish the act? . . . . . . . Here is a rational act, rationally done. In my apprehension, where you are able completely to establish that, the law does not require you to go further."

This case, as will readily be perceived, goes much further than we are required to go in the case at bar; but it shows the strong tendency of the courts to uphold the will of a testator when made conformably to his wishes, who at the time of the act done, whatever may have been his immediate antecedents, was of sound and disposing mind and memory, and gave exhibition of such faculties at the time, and by the dispositions of his property in the instrument itself. Under this view, and inasmuch as the evidence shows *without contradiction* that Judy, on the day he executed his will, possessed the necessary testamentary capacity, we hold that the demurrer to the evidence by the proponents should have prevailed.

As to the instructions, speaking of them in a general way, they seem in the main to have been correct; but it is unnecessary to scan them narrowly, inasmuch as the verdict is so clearly for the right party that it is wholly immaterial even if error did occur in them, as it should not be permitted to change the

announced result.    This has often been so decided by this and other courts.    *Fitzgerald v. Barker*, 96 Mo. 661; *Macfarland v. Heim*, 127 Mo. 327; *Greer v. Bank*, 128 Mo. 559; *Vogg v. Railroad*, 138 Mo. 172; *Fox v. Windes*, 127 Mo. 513; *Brobst v. Brock*, 10 Wall. 519; *Osborne v. Morgan*, 137 Mass. 1.    The same line of remark applies to errors alleged to have occurred in rejecting evidence offered by contestants, since none of that evidence thus rejected related to anything done on the day of the *factum*.

The only point now remaining for discussion is whether the testimony of the alleged admissions of Mrs. Belcher, one of the proponents of the will, or who, at least, was associated with that side of the case, though she made default, should have been admitted in evidence against the proponents.    Such alleged admissions were the following:    "She thought the old man old and feeble, and she did not consider him competent to do business, and his mind was not what it was once, or something to that effect."    This admission was offered to be proved by Mr. W. A. Smith. The other alleged admission was offered to be proved by Hildebrand:    "She said that he (testator) was not capable of making a will at all times."    There are authorities in this State to the effect that such admissions are competent evidence.    But on the other hand there is much authority to the contrary, and perhaps the great preponderance of the authorities is opposed to the view asserted in the early case of *Armstrong v. Farrar*, 8 Mo. 627.    See Underhill on Ev., sec. 67, and cases cited; Freeman on Co-tenancy and Part. [2 Ed.], sec. 169, p. 249; 9 Am. and Eng. Ency. of Law, 343; 11 *Ib.* 157; *Thompson v. Thompson*, 13 Ohio St. 356; *O'Connor v. Madison*, 57 N. W. Rep. 107; 1 Greenl. Ev. [14 Ed.], sec. 174.

But be this as it may, it is unnecessary to rule the

point and for these reasons.    The admission that Smith stood ready to establish, did not go to the capacity of Judy to make a will, but to his competency to make a contract, and our decisions all show that a man may be entirely competent as to the former, while incompetent as to the latter.    The admission offered to be proved by Hildebrand asserted, not that Judy was incompetent to make a will, but that he was not so capable "at all times;" *non constat* but that he was entirely competent at the time the will in question was made.

Holding these views, it results that the judgment should be affirmed.    All concur.