HELEN SCHOENHOFF and JOHN GRUENINGER v. LULU HAERING, GEORGE GRUENINGER, ROBERT GRUENINGER, and HELEN GRUENINGER, Executrix of Estate of ROBERT GRUENINGER, Appellants. —38 S. W. (2d) 1011.

Division One, May 21, 1931.

*Clarence G. Baxter* and *Harry F. Russell* for appellants; *Bernard B. Baxter* of counsel.

*E. McD. Stevens* for respondents.

FERGUSON, C.—This is an action contesting the will of Robert Grueninger, who died at St. Louis County on October 4, 1925. By the will, in controversy here, executed on June 24, 1925, testator devised all of his property to his wife, Helen Grueninger, for and during her natural life, with full power to rent, lease, mortgage, sell and dispose of all or any part thereof and execute deeds therefor, and at her death the property remaining undisposed of to vest in his children. as follows : to his daughter, Lulu Haering, the property occupied by him, consisting of about two acres, with all improvements thereon, together with all furniture and personal property thereon; to his son George Grueninger, sixty acres of land with buildings and improvements, upon which said George was residing; to his daughter Helen Schoenhoff, and his sons Robert Grueninger and John Grueninger, as tenants in common, fifty acres of land. The will further provided that the property devised to his children was upon condition that his wife failed to exercise the

power of sale coupled with her life interest, and if the said wife disposed of any of the property devised to the children, then whatever property remained undisposed of at her death was to "be marshalled and divided in proportion to the value of the tracts specifically devised to the devisees aforesaid." Said will then devised all the residue of his property to his children, share and share alike. Two of the three last named children, Helen Schoenhoff and John Grueninger joined as plaintiffs in bringing this action, making the testator's other children, Lulu Haering, George Grueninger and Robert Grueninger and testator's widow, Helen Grueninger, the mother of all said children, defendants. As grounds for setting aside the will the petition alleges undue influence and mental incapacity. At the conclusion of all the testimony in the case, the court sustained defendants' demurrer to the evidence as to the issue of undue influence, and submitted the case to the jury on the one issue of mental capacity. A verdict was returned finding that the purported will "is not the will of Robert Grueninger, deceased." Judgment was entered accordingly, and defendants appealed. Appellants assign as error the action of the court in overruling their demurrer offered at the close of all the testimony in the case to the evidence on the issue of testamentary capacity and the submission of that issue to the jury; the admission of certain testimony, and the giving of instructions B and C offered by plaintiffs.

Robert Grueninger was seventy-six years of age at the time of his death. He went to St. Louis County with his family about the year 1887 and continued to make his home there until his death. He engaged in farming, but several years preceding his death retired from active farming operations. He owned 155 acres of valuable land in St. Louis County. The value of the two-acre tract mentioned in the will, and on which the family residence is located, was variously estimated at from $5,000 to $15,000. The value of the sixty-acre tract was variously placed at from $150 to $500 per acre, and the fifty-acre tract at from $300 to $400 per acre. Prior to about November, 1924, when his health first began noticeably to fail, Grueninger had apparently been in good health. He was five feet ten inches in height and weighed from 175 to 180 pounds and was a man of robust physique, intelligent, of pleasant disposition, a successful farmer and apparently a man of sound judgment and mind, and there is no suggestion, indication or intimation appearing in the evidence of any kind of mental impairment prior to April, 1925. The daughter Helen, one of the contestants, lived at home with her father and mother and assisted in the work on the farm until she was thirty years of age, when, in 1921, she married John Schoenhoff, who worked for her father, and they thereupon left the Grueninger home. Schoenhoff says in his testimony that Mr. and Mrs. Grueninger "put me out" on the day that he and Helen were

married, and "the old gentleman was never very friendly with me after I married the girl," and that he never talked with Mr. Grueninger again after that time until he called, on one occasion, with his wife to see Grueninger after he became ill. The testimony clearly indicates that Grueninger was displeased with the marriage of his daughter to Schoenhoff, but the record discloses, as interesting sidelights, that the marriage has proved a happy union and also that the Schoenhoffs have prospered. At the time of the trial a claim against the estate for $5400, alleged by Mrs. Schoenhoff to be due to her for services and labor in her father's home and on the farm, was pending in the probate court, but she testified that she intended to "withdraw it." The father had come to the financial assistance of the other contestant, his son John Grueninger, and had loaned him $2,000, for which he had taken John's notes. These notes were not paid, nor was any demand made therefor. It does not appear by contestants' testimony what was done with the notes, but John testified that he at one time offered to make a payment of $500 on this indebtedness and that his father refused to accept same, and further states: "I am indebted to the estate for $2,000 if they show me the notes." The widow testified that shortly before his death Grueninger directed her to burn the notes and she did so.

The son Robert Grueninger, one of the defendants, who under the terms of the will shares in the estate with and in the same proportion as the two contestants, resided in the city of St. Louis, where at the time of the trial he had been a member of the city fire department for sixteen years. The daughter Lulu Haering, a defendant, resided in St. Louis County, and the defendant George Grueninger, a son, rented land from his father which he had farmed for seven years preceding his father's death. The proponents of the will made a prima-facie case of testamentary capacity, the testimony being that about a week prior to the date of the execution of the will Grueninger appeared alone at the office of the Kuhs Realty Company in a part of the city of St. Louis known as "Baden" and told Mr. Edward L. Kuhs, with whom he had been acquainted for several years, that he wanted to make a will and how he wanted to dispose of his property. Kuhs made notations of the property and how and to whom it was to be devised and told Grueninger to return at a later date and in the meantime the will would be prepared. The will was drafted by Mr. Kuhs's attorney, a Mr. Mercier, and typed by Miss Lillian Lehr, a stenographer in the real estate office. On June 24, 1925, Grueninger again appeared alone at the real estate office and the will was read to him and he then read, approved and signed it in the presence of Kuhs, Mercier, Miss Lehr and Henry Daubendiek. Grueninger requested Miss Lehr and Dobendiek to sign as witnesses, which they did. Kuhs and the attesting witnesses testified that Grueninger at the time appeared to

be in good health and sound mind, and from a reading of their testimony it appears that Grueninger talked and acted in a normal and rational manner and that nothing occurred indicating any mental disturbance or impairment at that time.

We now set out the salient facts from the testimony offered by contestants to show mental incapacity. John Grueninger, one of the contestants, testified that in April, 1925, his father "took sick and stayed sick until he died" on October 4, 1925; that during that period he saw his father once or twice a week; that his father was confined to his bed most of that time and that he did not see him "up but once or twice" and that he "judged from his appearance that he was not able to get out of bed at any time." In response to the question: "State, Mr. Grueninger, some of the conversation you had with your father and what he said to you?" the witness testified as follows: "Well, when I would go to the house I would walk up to him and he would be in bed, and I said, 'Hello, Pop,' and he turned over and he would look at me and say, 'Who are you? I don't know you,' and then I said, 'This is John,' 'Oh, hello, John,' he would say, 'Alright, is that you?' And then he would turn over for a second or two and then would say nothing at all, and then turn back again and look at me and say, 'Is that you, John, look there what a fine team of bay horses are going up the road; and there would be no horses there. He even asked me if my tomatoes were ripe in the first part of June. If I was hauling tomatoes, and I did not have any. The tomatoes in that vicinity generally get ripe in July and August and September. My father raised tomatoes." The time these incidents occurred is not fixed by the witness other than the implication that it may have been before or about the first of June. The witness stated that his father appeared to have fever and to be delirious; that he was there twenty or forty times during the period from April to the date of his father's death, and that "possibly" ten of such times his mother was present in the room and "there was nothing out of the ordinary" in the conversation between his father and mother; that he saw his father "somewhere in the neighborhood of June 24, for I called there once or twice a week all the time he was sick until he died," but "I have no specific recollection whatever of any day that I saw him during the week of June 24th." The witness stated that in his opinion his father was mentally incapable of making a will in June, 1925, and that he bases that opinion on the fact that his father "was sick and stayed sick" and because "he talked about seeing a team of mules going up the road and horses; coming down from upstairs in his underclothing, and such things as that."

Ellen Grueninger, wife of the contestant John Grueninger, testified to making visits, with her husband, to her father-in-law's home "once or twice a week from April to the date of his death in Octo-

ber'' and relates the same incidents described by her husband without attempting to fix any time specifically or approximately that same occurred.

Dr. Schuedde, a physician in the city of St. Louis, first called on Grueninger in November, 1924, at which time he found Grueninger complaining of pains in the stomach, vomiting and ''feeling bad generally.'' At that time the doctor diagnosed the trouble as ulcer of the stomach. Dr. Schuedde continued his visits and treatment until April 20, 1925, when he saw Grueninger the last time professionally. During that period he visited the patient ''perhaps fifteen or twenty times.'' In December the doctor concluded that Grueninger was suffering from cancer of the pancreas although he did not advise the patient or any member of the family of this diagnosis. The doctor's testimony was that during a period of from about March 17 to April 20 when he ceased treatment of the patient, Grueninger was a very sick man and his daughter-in-law, the wife of George Grueninger, a graduate trained nurse was almost in constant attendance. Dr. Schuedde testified that at times during this period ''the absorption of poison from the cancer'' caused Grueninger to be delirious; that he would ''grab at imaginary objects;'' that he talked reasonably well in the beginning, but that he got worse ''and did very little, if any, talking the latter part of the time I waited on him;'' that ''the cancerous condition and the poison being absorbed had a positive effect on his mind and brain,'' which statement we take in connection with a further statement by the witness that ''pain is sometimes sufficient to produce deliriousness; that fever very frequently brings about a delirious condition;'' that such condition is ''only temporary and during the time the excessive pain is being experienced or the fever is high.'' On Decoration Day in May following, the doctor met Mr. Grueninger in a barber shop in Florissant and a casual and apparently normal conversation ensued.

The witness, Mathilde Grueninger, nineteen years of age, the daughter of contestant John Grueninger, testified that she stayed at her grandfather's home at one time in the year 1925, for a period of about five weeks and that there were times that he was ''out of his head;'' that sometimes he would mistake her for his daughter-in-law; that ''he talked about chickens and one thing and another that was not around there'' and at such times ''he would be out of his head for two or three minutes at a time, then he would go to sleep.'' We are unable to determine the time to which the testimony of this witness relates, but apparently to a period in April and not later than the first week in May, 1925. The witness was very positive that she was not there during the month of June and that Dr. Schuedde was calling on her grandfather during the time she was staying there.

Myrtle Grueninger, age seventeen, another granddaughter of testator, testified that "I guess I was there (referring to her grandfather's home) about thirty times all together" and though the period of time referred to is not fixed, we think it apparent that she refers to a period from April until the death of her grandfather in October. Without fixing the time of the occurrence she says: "One time when I was there he talked about something he had seen. He saw horses and chickens and that kind of stuff." She testifies further about an incident, the time of which she fixed as May, 1925, that "he went down stairs in his underclothes and when they saw him they put him in bed down stairs and when we got ready to go home I said, 'Good bye grandpa,' and he didn't know none of us that night when he said good bye."

Helen Schoenhoff, one of the contestants, testifies that she saw her father for the first time in 1925 in March, saw him two or three times in April and one time in May, but did not see him in June or July and not again after the occasion in May until August 31. She states that on these visits her father recognized her and it appears that his conversations with her were rational, with the exception that on the occasion of the one visit in May her husband accompanied her and her father asked, "Who is that?" and the witness said, "That is my John," and thereupon Grueninger said, "Oh, is that you John?" This visit was the first time Schoenhoff had been to the Grueninger home or talked to Mr. Grueninger since the marriage. Mrs. Schoenhoff was with her father continuously during his later illness, the last part of September, and in October, and states that he was delirious at times during that period.

A. F. Heinrichs, the owner of a barber college in the city of St. Louis, testified that he had known Grueninger for thirty years and had often visited at the Grueninger home; that he went to see Grueninger on Thursday of the first week in June, 1925, and found him in bed and noticed a change in his physical condition since he had last seen him in April before; that Grueninger looked to weigh not more than 135 pounds and that "when we went into the room he did not know me. John walked in ahead of me and said 'Hello, papa' and Mr. Grueninger did not say anything. I walked over to the side of the bed and said, 'How are you, Mr. Grueninger?' and he did not say anything to me, and finally John walked over to him and said, 'Don't you know me, pop?' and he looked around and said: 'Why, yes, John,' and then asked, 'Who is that man?' and John said, 'Don't you know him? That is Heinrichs, the barber,' and Mr. Grueninger did not say a word, and I did not attempt to carry on any more conversation with him."

Mindful of the rule that in determining the sufficiency of the evidence upon the demurrer, proponents' evidence must not be taken

into consideration except in so far as it aids, if it does aid, contestants' case, we shall not attempt to detail the evidence adduced by proponents, but merely state that the testimony of the defendants and members of their families as well as some ten or twelve close neighbors of the deceased and several others not so intimately acquainted with him but who testify to certain specific incidents, is to the effect that while Grueninger was very sick for about five weeks in April and May, he seemed to thereafter show a marked improvement in health, regained weight lost and during the months of June, July and August and the first part of September, visited about the neighborhood, looked after a fish pond from which he derived some income, worked about the orchard, visited and conversed with men working in the fields, attended church five miles from home every Sunday, mowed the lawn, fed the chickens, did chores about the house and was at all times rational and of sound mind and that there was nothing in his conduct or demeanor indicating any mental impairment; that on June 23, 1925, the day before the will was executed, he attended a funeral where he met and talked with a number of neighbors and friends who testified to the incident and that he was of sound mind; that he neither had nor required treatment or the services of a physician after Dr. Schuedde ceased to treat him in April until about the middle of September when he again became ill, was confined to his bed and a Dr. Van Hoefen was called to attend him; that at that time he was suffering from acute nephritis and that during the last week or ten days of this illness, which resulted in his death, was often delirious.

On the demurrer we accept contestants' testimony as entirely true and accord them every reasonable inference of fact arising therefrom, but "forced and violent inferences" cannot be allowed; and, since proponents' evidence in no way aids contestants' case, we look only to the admitted and uncontradicted facts and the tendency of contestants' reasonable and material proof to determine whether there was substantial evidence to warrant submission of the issue of mental incapacity to the jury. [Turner v. Anderson, 260 Mo. 1, 168 S. W. 943; Fowler v. Fowler, 318 Mo. 1078, 2 S. W. (2d) 707; Smarr v. Smarr, 319 Mo. 1153, 6 S. W. (2d) l. c. 860.]

It is not questioned that prior to April, 1925, Grueninger was of sound mind and intellect. Upon an analysis of the testimony relating to incidents subsequent thereto and offered as tending to show later mental incapacity we find no evidence indicating senile dementia, chronic insanity or insanity of a permanent, progressive or continuing nature. It is obvious that the irrational statements attributed to Grueninger were made while he was in a state of delirium caused by pain and fever and that these periods of delirium were of a brief and fleeting nature, transitory and intermittent. The evidence does not show or tend to show a diseased mind or a

mind warped by insane delusions, but only that at times prior to the execution of the will (confined in so far as time is fixed to April and May and not later than the first week in June) Grueninger was delirious and had certain hallucinations. A distinction is well made in Bensberg v. Washington University, 251 Mo. 641, 158 S. W. 330, between such hallucinations and insane delusions, and it is said in substance that hallucinations are tricks of the senses as when one in a delirium sees things where there are no such things; insane delusions are seated, fixed and continuing false beliefs, and while hallucinations are but temporary and pass away, the insane delusion remains. Page on Wills (2 Ed.), vol. 1, page 275, says: "Delirium is a form of mental aberration incident to febrile disease and sometimes to the last stages of a chronic disease. It is temporary in its nature; and thus is to be distinguished from the insane delusion. In determining the validity of a will, delirium is treated as a form of temporary insanity and is subject to the same tests. If the effect of the delirium is to deprive testator of the ability to understand the nature and extent of his property, the proper objects of his bounty and the nature of the act which he is about to perform, he can not make a valid will. If testator, though suffering occasionally, or to a slight extent, from delirium, has, nevertheless, sufficient mental capacity to understand the nature and extent of his property, the proper objects of his bounty and the nature of the act which he is about to perform, he can make a valid will. The difference between delirium and insanity of the ordinary type is as to the presumption of continuance. Delirium is not presumed to continue; ordinary insanity is. . . . In delirium the lucid interval is the normal condition, which returns as soon as the severity of the disease abates." The showing that a person was delirious at any given period of time raises no presumption that such condition existed either at an antecedent or subsequent time and though the testimony of contestants is to the effect that prior to the execution of the will the testator was at times delirious and suffered temporary mental aberrations, no presumption of the continuance of such condition arises and the presumption of sanity will prevail. [Von De Veld v. Judy, 143 Mo. 348, 44 S. W. 1117; State v. Lowe, 93 Mo. 547, 5 S. W. 889; Page on Wills (2 Ed.), p. 1147.]

Proponents of the will made a prima-facie case of testamentary capacity at the time of the execution of the instrument in controversy and unless contestants have adduced some substantial evidence tending to show that the testator was mentally incompetent at the time to make a valid will as alleged, the instrument is entitled to be established and probated as the will of Robert Grueninger. As we have pointed out, evidence tending to show that prior to the making of the will Grueninger suffered intermittent and occasional spells of delirium resulting in temporary mental dis-

turbance and testamentary incapacity is not sufficient, for such condition is not presumed to continue and to defeat the will the evidence must tend to show that such condition existed and was operative on the mind of testator at the time he executed the will. The competency to make a will is determined by the state and condition of the testator's mind at the time the will was made. [Von De Veld v. Judy, supra; Winn v. Grier, 217 Mo. 450, 117 S. W. 48; Buford v. Gruber, 223 Mo. 231, 112 S. W. 717; Byrne v. Fulkerson, 254 Mo. 97, 162 S. W. 171.] It is well settled by the decisions of this court that evidence of occurrences and circumstances prior to and closely approaching the time of the execution of the will, and shortly subsequent thereto, which tends to shed light on the question of testamentary incapacity and tends to show the condition of testator's mind at the time of the execution of the will, is competent, and it is not required that proof of testamentary incapacity at the very moment be made by eye witnesses. [Von De Veld v. Judy, supra; Byrne v. Fulkerson, supra; Hoctor v. Pavlick (Mo. App.), 199 S. W. 1038.] There is no evidence in this case showing or tending to show that the testator suffered a recurring attack of delirium or was in a delirious state or condition on, near or closely approaching June 24, 1925, the date the will was executed. With the exception of one statement attributed to his father by John Grueninger that "he even asked me if my tomatoes were ripe in the first part of June," John and Ellen Grueninger do not fix any time when the incidents they relate occurred, but say that they have no recollection as to any specific date or time in the month of June, though they assert they saw Grueninger in June because they "visited him once or twice a week."

Dr. Schuedde fixes the time of the "delirious spells" to which his testimony relates as in March and April and prior to April 20, when he ceased attending him. Mathilde Grueninger's testimony refers to a period not later than the first week in May. Myrtle Grueninger relates two incidents, but cannot fix the time as to one and states the other occurred some time in May. The one slight circumstance mentioned by Mrs. Schoenhoff occurred in May and Heinrichs testified that he visited Grueninger during the first week in June.

If the testimony had shown the recurrence of delirium causing mental aberrations at a time so near and closely approaching the time he executed the will that an inference of fact might be reasonably and legitimately drawn that the mental disturbance or the beclouding of the mental faculties may not have ceased or subsided and still existed at the time, then, we think, it could be said to be of such a substantial nature as to require the submission of the issue to the jury. As we have heretofore observed, on the demurrer we take the testimony offered by contestants as true but that testimony is not inconsistent with testamentary capacity on the date and at the

time of the execution of the will. The facts in this case distinguish it from that class of cases wherein the testimony shows prior insanity of a permanent nature, raising a presumption of continuity and warranting the inference that it existed at the time of the making of the will, for substantial evidence of prior mental unsoundness of that kind, with evidence of proponents to the contrary, makes a case which generally should be submitted to the jury that they may resolve the conflict. [Buford v. Gruber, supra; Byrne v. Fulkerson, supra.] It follows that the trial court erred in refusing defendants' peremptory instruction in the nature of a demurrer to the evidence on the issue of testamentary incapacity and in submitting that issue to the jury.

Appellants complain of Instruction B given at the request of respondents and say it overstates the capacity required to make a will. The instruction reads:

"The court instructs the jury that, in determining the issue of sufficient soundness of mind or testamentary capacity possessed by the testator to make a will, you are instructed that, if a person has not mind and memory enough to understand the ordinary affairs of life, the value, extent, and nature of his property, the number and names of the persons who are the natural objects of his bounty, their deserts with reference to their conduct and treatment of him, their capacity and necessity, and has not active memory enough to retain all these facts in his mind long enough to have his will prepared, he has no power to dispose of his property by will."

It is sufficient to say that the standard or test for determining testamentary capacity prescribed by the instruction is announced and approved in Byrne v. Fulkerson, supra; Ray v. Walker, 293 Mo. 447, 240 S. W. 187; Crum v. Crum, 231 Mo. 626, 132 S. W. 1070, and Rock v. Keller, 312 Mo. 458, 278 S. W. 759. In Ray v. Walker it is said: "A mind not coming up to that standard is not a testamentary one," and in Byrne v. Fulkerson: "If the mind of the testator does not measure up to the standard fixed by this rule, he is incapable of making the will."

Appellants assert the court erred in giving respondents' Instruction C that "the burden rests upon the defendants to prove by the greater weight of all of the credible evidence that Robert Grueninger, at the time of signing the paper writing in question, possessed a sound and disposing mind and memory, as defined in other instructions." The instruction correctly places the burden of proof as to testamentary capacity, which remains upon proponents throughout the case. [Smarr v. Smarr, supra; Rock v. Keller, supra; Goodfellow v. Shannon, 197 Mo. 271, 94 S. W. 979; Major v. Kidd, 261 Mo. 607, 170 S. W. 879; Mayes v. Mayes (Mo.), 233 S. W. l. c. 105; Berkemeier v. Reller, 317 Mo. 614, 296 S. W. 739.]

In the course of the trial plaintiffs were permitted to amend their petition to make same charge that defendants conspired and confederated together for the purpose of unduly influencing testator in the execution of his will, and as tending to support, that allegation plaintiffs from time to time offered to make proof of statements in the nature of admissions alleged to have been made by two of the defendants at various times and out of hearing of the other defendants and each other. The court repeatedly ruling that no evidence of a conspiracy having been adduced, upon appellants' objection, excluded such testimony, with the exception that the witness John Schoenhoff was permitted, over defendants' objection, to testify to certain statements and admissions which he said were made by defendant Helen Grueninger and admissions by defendant Lulu Haering. The general rule is that where there are other contestees interested in upholding the will, the admissions of one contestee tending to defeat the will are not admissible. [Schierbaum v. Schemme, 157 Mo. 1, 57 S. W. 526; Teckenbrock v. McLaughlin, 209 Mo. 533, 108 S. W. 46.] In this case the petition as amended charged a conspiracy between all the defendants to unduly influence the testator in the making of the will. Meier v. Buchter, 197 Mo. 68, 94 S. W. 883, holds that where the evidence tends to show such conspiracy exists then the admissions of any one of the contestees relating to such conspiracy, "touching its subject-matter and in furtherance thereof, are admissible." In this case the trial court ruled that no evidence was adduced tending to show the existence of the conspiracy charged, and therefore the admissions alleged to have been made by defendants Helen Grueninger and Lulu Haering should have been excluded. Respondents say that the testimony of Schoenhoff, of which complaint is made, was admitted on the issue of undue influence, and if error was committed it was harmless error, for that issue was not submitted to the jury. However, we deem it unnecessary here to discuss the matter further than to observe that since the case will be reversed and remanded, if upon the retrial testimony should first be introduced fairly tending to show and establish a privity of design among the contestees to unduly influence testator in the making of the will, under the authority of Meier v. Buchter, supra, such admissions would be acceptable, but in the absence of proof of conspiracy the rule as laid down in Schierbaum v. Schemme, supra, should be followed.

The cause is reversed and remanded for a new trial. *Seddon* and *Sturgis, CC.,* concur.

PER CURIAM:—The foregoing opinion by FERGUSON, C., is adopted as the opinion of the court. All of the judges concur.