[Crim. No. 1861.   Third Dist.   Mar. 17, 1944.]

In re PATRICK JOSEPH McMANUS, on Habeas Corpus.

Charles Kasch for Petitioner.

James E. Busch, District Attorney, for Respondent.

THOMPSON, J.—By means of habeas corpus the petitioner Patrick Joseph McManus seeks to obtain his release from the Mendocino State Hospital, pursuant to section 6760 of the Welfare and Institutions Code, for the purpose of enabling him to defend himself on a charge of murder which is pending against him in the Superior Court of Los Angeles County.   On February 24, 1937, an indictment was returned by the Grand Jury of Los Angeles County, charging the petitioner with the crime of murder.   On February 26, 1937, he entered pleas of not guilty and not guilty by reason of insanity.   On March 16, 1937, the trial judge expressed a doubt as to McManus' present sanity and pursuant to section 1368 of the Penal Code set a hearing on that issue for March 30, 1937.   On the latter date a jury regularly impaneled for the purpose of considering the present sanity of petitioner found him to be insane.   The Superior Court of Los Angeles County thereupon committed him to the custody

of the Superintendent of the Mendocino State Hospital, Mendocino County, California, until he regained his sanity, whereupon he was to be returned to the custody of the Sheriff of Los Angeles County for trial, as provided by section 1372 of the Penal Code.

On September 17, 1943, petitioner made an application to the Superior Court of Mendocino County for a writ of habeas corpus claiming that his imprisonment in the Mendocino State Hospital was illegal in that he was at that time sane, and able to consult with counsel and enter upon his defense of the felony charge pending against him in the Superior Court of Los Angeles County. After a hearing in which medical testimony and evidence by the petitioner were introduced, the superior court entered an order discharging the writ of habeas corpus and remanding petitioner to the custody of the Superintendent of the Mendocino State Hospital.

Section 6760 of the Welfare and Institutions Code provides that:

"A patient committed to a State hospital under the provisions of Chapter VI, Title X, Part II, of the Penal Code, shall, upon the certificate of the superintendent that the person has recovered, approved by the superior judge of the county from which the patient was committed, be redelivered to the sheriff of such county, and dealt with in accordance with the provisions of the above-mentioned chapter of the Penal Code."

On November 12, 1943, petitioner filed a petition with this court praying that a writ of habeas corpus issue, directed to the Medical Superintendent of the Mendocino State Hospital, to test the legality of his restraint and imprisonment. On November 29, 1943, this court appointed the Honorable Benjamin C. Jones, Judge of the Superior Court of Lake County, as referee, to hear and take testimony of all witnesses in the matter of petitioner's application and further ordered that the referee prepare and file in this court findings of facts based upon the testimony relating to the issue of petitioner's sanity.

The matter concerning petitioner's sanity was heard on December 6, 1943, before said duly appointed referee. During the proceeding, three physicians, including Doctor M. J. Rowe, Medical Superintendent of the Mendocino State Hos-

pital, testified regarding the present sanity of petitioner. The doctors who testified all agreed that petitioner's mental condition was such as to prevent him from consulting with counsel in such a manner as properly to prepare his defense to the crime with which he was charged. The medical testimony was to the effect that petitioner's exercise of judgment would be definitely impaired by certain delusions which were experienced as a result of a form of persecution complex. Doctor Rowe testified in part, as follows: "A. He could consult with his attorney, but I think his statements would be influenced by his delusions so that there would not be a rational opinion." Doctor Louise Petty, in answer to the question concerning petitioner's ability to aid in the preparation of a rational defense, testified: "A. I feel that he has a good many delusionary ideas which are tied together in his mind concerning the neighborhood in which he lived, and somewhat with the City Hall, and the lawyers in Los Angeles, and their connection with this alleged crime. I think he is definitely delusionary about those things and definitely retains those delusions and has all the time I have known him." It was admitted by the examining physicians that there were intervals when the petitioner appeared to be quite normal but that generally his mind was preoccupied by the delusions referred to. Each testified that in his opinion the petitioner was insane.

Three physicians from the medical staff of the Mendocino State Hospital, one of whom had observed the petitioner over a period of six years while he was an inmate at that hospital, and who had participated in six conferences regarding his mental condition, testified that it is their opinion he is of unsound mind and not capable of rationally defending himself in the trial of the criminal charge against him. They base those opinions upon medical examinations of the patient, from statements which he made to one or more of them while he was confined in that institution, from observations and from listening to his testimony at the trial. They appear to agree that he is possessed of fixed delusions of persecution. One of them characterized his ailment as paranoia. They infer that he is sometimes more lucid and logical in his statements than at other times. He is indefinite and general in his charges of persecution, avoiding mentioning the names of particular individuals, but placing the blame for

his troubles and prosecution upon groups, organizations or societies. Nevertheless it seems clear that he possesses fixed delusions that his troubles and the reason for the institution of the criminal charge against him are due to persecution of designated groups of individuals, which is recognized as a symptom of "persecutory paranoia." A definition of that incurable mental disease is found in 17 Encyclopedia Britannica, 14th ed., page 266. It reads in part:

"A chronic mental disease, of which systematized delusions with or without hallucinations of the senses are the prominent characteristics. The delusions may take the form of ideas of persecution or of grandeur and ambition. The disease may begin during adolescence, but the great majority of the subjects manifest no symptoms of the affection until full adult life."

On the witness stand, and in conversations with the physicians, the petitioner persistently asserted that he believed he was being persecuted and opposed by the conspiracies of groups of persons variously referred to as the "peace officers," the "homicide squad," "gangsters," the "Hibernians," the "Odd Fellows," and the "Ku Klux Klan." Speaking of the lawyer who represented him at the hearing of the criminal charge, in response to the question, "How many lawyers did you have?" he replied, "I don't know how many there was there, but I counted six." Doctor Rowe, the superintendent of the hospital, said that he believed he was of unsound mind because of his delusions. He said:

"His belief for one thing that those charges are brought primarily because of gangster enemies, who, he believes, are trying to punish him for not having joined various secret societies, and other people in the neighborhood that he thought were against him, neighbors who had criminal interests and were opposed to him and his wife. I think he believes that the chief source of his troubles is due to those persecutors."

It is interesting to note the fact that in illustrating the tendency of a person afflicted with paranoia to refer to his persecutors in indefinite manner, or by groups, rather than by individual names, it is said in the text found in Britannica, above cited:

"He often never fixes the direct blame upon any individual, but refers to his persecutors as 'they' or a 'society,' or

some corporate body such as 'lawyers,' 'priests' or 'freemasons.' "

That is characteristic of the accusations of the petitioner in this proceeding. Doctor Petty testified that the petitioner in charging his neighbors with persecution mentioned "fifty families and connected them up." She said that he included the authorities of the hospital in the imagined conspiracy against him by saying: "He told me this morning that he had been prevented from receiving letters from his sister *through religious bigotry at the Hospital.*"

The foregoing testimony furnishes satisfactory evidence of the existence of fixed delusions strongly indicating the presence of paranoia and an unsound mind. At least that is the unanimous judgment of the medical expert witnesses.

The Honorable Benjamin C. Jones, after hearing considerable testimony in the matter, including the testimony of petitioner, made findings of fact concluding that petitioner had not recovered his sanity since his commitment to the hospital and that he was still insane at the time of the hearing. The findings stated that although petitioner experienced interludes of rationality and clarity of mental processes that he nevertheless suffers from delusions which influence his actions and would prevent him from advising with counsel in a rational manner. The findings also conclude that petitioner in his present confinement and restraint is not dangerous to himself or to others but that if he were removed from protectional restraint the actions he would take under different circumstances are uncertain.

Petitioner contends that the only question to be determined by the habeas corpus proceeding is that of the ability of petitioner to counsel with his attorney and to conduct a rational defense to the charge of murder pending against him. It is further contended that the testimony adduced at the hearing supports the conclusion that petitioner did have such mental capacity and was proved to have adequate mental ability properly to conduct a defense to the crime charged. In support of his position petitioner cites the case of *In re Buchanan,* 129 Cal. 330 [61 P. 1120, 50 L.R.A. 378], wherein it was determined, contrary to the conclusion of alienists, that the petitioner therein was capable of conducting his defense to the crime charged in a rational manner. Accepting the construction of the pertinent Penal Code provisions, sections 1367 to 1373, as decided in the Buchanan case, to the

effect that an individual may be deemed sane for the purposes of standing trial on a criminal charge, although mentally deranged and unsound otherwise, it nevertheless appears that the circumstances in the Buchanan case were quite different from those presented in the instant proceeding. In that case the opinion, after ascribing the petitioner's temporary insanity to the excessive use of intoxicating liquor, proceeded to hold that such insanity would not disqualify him from making his defense. It referred to the general intelligence and demeanor of the petitioner at page 335 of the opinion, in the following language:

"But this is a species of insanity which the statute governing this case does not contemplate. It is not such insanity as would disable him to make his defense. The same witnesses that testify that he is insane admit that during his long stay at the Napa asylum he has exhibited no symptom of insanity. He reasons as other men do, he has no delusions, he is more than ordinarily intelligent, his memory is unimpaired, he appreciates exactly the nature of the criminal charge against him, and his relations to the proceeding. As far as mental operations are concerned he is sane as men are ordinarily. According to the testimony of Dr. Smith, under whose care he was at Napa, if he had to judge alone by what he saw of him there he would be obliged to discharge him; and this testimony is strongly corroborated by all the other evidence, both professional and non-professional, as to his behavior at the asylum.

"But the most conclusive evidence on this point is the testimony of Buchanan himself. He was not sworn as a witness, but he offered himself as an exhibit, and not only by his statement but by his appearance and bearing, both in the superior court and in this court, he showed a perfect possession of his faculties and complete ability to conduct his defense."

The testimony adduced at the hearing in the present proceeding certainly fails to disclose petitioner as an individual possessed of his faculties such as was proved to be the situation in the Buchanan case. To the contrary, it appears that the petitioner herein is subject, almost continuously, to delusions and irrationality of mental processes.

The case of *People* v. *Woods*, 19 Cal.App.2d 556 [65 P.2d 940], cited by petitioner, does not, in our opinion, lend aid

to the argument that petitioner is sufficiently competent to conduct a rational defense to the charge of murder pending against him. That case simply recognizes, as does the opinion in the Buchanan case, *supra,* that there may be different phases of insanity and that there are special distinct legal tests applied in determining the question. There is nothing contained in the opinion in the Woods case, *supra,* however, which would induce us to conclude that petitioner in the instant case was of sufficient sound mentality enabling him to conduct a rational defense to the charge of murder which is pending against him.

The evidence based upon the testimony given at the hearing before the referee in this case sufficiently supports the findings to the effect that petitioner has not recovered his sanity. We therefore adopt the findings of the referee as the findings of this court.

We conclude from the testimony of the medical expert witnesses and from the other evidence adduced that the petitioner has not so far recovered his sanity as to enable him to defend himself reasonably and properly against the criminal charge.

The writ is discharged.

Adams, P. J., and Peek, J., concurred.