ROBERT J. AMBRUSTER, (Plaintiff) Respondent, v. MARGUERITE RENO SUTTON and THE SALVATION ARMY, a Corporation, (Defendants) Appellants, RUTH FLEMING HOLLOCHER, (Defendant) Respondent, FRANK E. MORRIS, Administrator C.T.A., of the Purported Last Will and Testament of EDITH E. AMBRUSTER, Deceased; ROLLA LAKE; MYRTLE LAKE; LUCY EYNCK; ALICE FILKINS; SUSIE CAMERON; ST. LOUIS UNION TRUST COMPANY, a Corporation, Trustee Under the Purported Last Will and Testament of EDITH E. AMBRUSTER, Deceased; Defendants, No. 42229—244 S. W. (2d) 65.

Division Two, November 12, 1951.

Motion for Rehearing or to Transfer to Banc Overruled, December 10, 1951.

*Wayne Ely* and *Richard H. Ely* for appellant Marguerite Reno Sutton, *G. A. Buder* and *Richard O. Roberts* for appellant The Salvation Army; *Ely & Ely* of counsel.

*Berryman Henwood, Harvey B. Cox, Harvey B. Cox, Jr.,* and *William A. Moffitt, Jr.,* for respondent Robert J. Ambruster; *Claude W. McElwee* for respondent Ruth Fleming Hollocher; *Cox & Cox* of counsel.

744

746

WESTHUES, C.—Plaintiff Robert J. Ambruster filed this suit to contest the last will and testament of Edith E. Ambruster, deceased. It was alleged in the petition that the testatrix was on the day she signed the purported will, that is, September 29, 1948, of unsound mind. A trial resulted in a verdict that the paper writing offered in evidence was not the last will and testament of Edith E. Ambruster. From the judgment entered an appeal was taken. It was stipulated that the amount in dispute was over $250,000, thereby vesting this court with appellate jurisdiction.

Edith E. Ambruster died June 3, 1949; she was the widow of William Ambruster who died in 1916. Plaintiff, who was their only child, was born in August, 1894. Ruth Fleming Hollocher when an infant was taken into the Ambrusters' home and reared by them. She was named as a defendant in this case but joined plaintiff in asking that the will be declared void. All of the persons mentioned in the will were made defendants. Marguerite Reno Sutton, a niece, Susie Cameron, and the Salvation Army were the principal beneficiaries. Lucy Eynck was given $5,000 and Alice Filkins was given $1,000. Rolla Lake and Myrtle Lake were mentioned in the will but were not given any bequest. Frank E. Morris, the administrator c. t. a., was also named as a defendant. The two respondents, plaintiff Robert J. Ambruster and the defendant Ruth Fleming Hollocher,

were mentioned in Articles I and II of the will. These articles read as follows:

"I.

"I am the mother of only one child, Robert J. Ambruster, and he is not to share in any part of my estate, although he does have my forgiveness.

"II.

"I took into my home, in her infancy, and reared one Ruth Fleming Hollocher, although she was never adopted by me, and it is my desire that she take nothing under this will."

Marguerite Reno Sutton and the Salvation Army appealed from the judgment.

The principal point briefed by appellants pertains to the question of the sufficiency of the evidence to support the verdict. It is appellants' contention that the question of mental capacity on the part of the testatrix should not have been submitted to a jury. Appellants say further that their instruction withdrawing from the jury the question of insane delusions should have been given. A few points were briefed as to the admission of evidence given by expert witnesses and the inclusion of matters in hypothetical questions.

William Ambruster, the husband of testatrix, established and conducted an undertaking business in the City of St. Louis. This business was incorporated in 1915. The shares, 20 in number, were divided among the family: William Ambruster 15, the testatrix 3, and plaintiff received 2 shares. William Ambruster died intestate. Testatrix and her son, the plaintiff, continued to operate the business. Plaintiff was paid a salary. A dispute arose as to the ownership of the shares in the corporation and plaintiff filed suit against his mother. The case was decided by this court in September, 1930. The court decreed that Mrs. Ambruster was entitled to 10.875 shares and the plaintiff was entitled to 9.125 shares of the corporate stock. This court also held that Mrs. Ambruster owed her son, the plaintiff, the sum of $2,475 as representing dividends. See Ambruster v. Ambruster, 326 Mo. 51, 31 S. W. (2d) 28. Mrs. Ambruster paid the judgment of $2,475 but disregarded her son's share in the corporation as decreed by this court. Plaintiff, her son, did not attempt further to enforce his rights. Thereafter the plaintiff established an undertaking business of his own and Mrs. Ambruster continued to operate the business of the William Ambruster Undertaking Company.

The evidence reveals that the testatrix was a woman of business ability and of a domineering nature. She was an active member of the Eastern Star, attended many of its conventions, and served a term as Grand Matron. She successfully operated two funeral homes for many years, one at 4053 Lindell Avenue and another at 4234

Manchester Avenue. Henry A. Hamilton acted as her legal advisor in business matters. He had been the attorney for her husband. Except for the time that Hamilton served as a circuit judge in the City of St. Louis, he was a trusted friend and advisor of the testatrix. During the years often referred to as "the depression," Mrs. Ambruster was heavily indebted. She owned much real estate which was mortgaged. Hamilton's advice was often sought and he aided the testatrix in successfully bridging the depression to her financial advantage. The relations between testatrix and her son during all of these years were a little strained, not to the point of being unfriendly, however. They were on speaking terms and on one occasion when plaintiff was on a vacation, testatrix wrote her son many letters of a friendly nature. She was always concerned when she did not hear from plaintiff on her birthdays or on other occasions when friendly greetings were in order. There is no evidence that prior to 1946 either spoke ill of the other. There is evidence that testatrix objected to her son's marriage; he was a competitor and he had dared to assert his ownership of stock in the William Ambruster Corporation which he had inherited from his father. The evidence justified the conclusion that Mrs. Ambruster secretly loved her son, in fact to a degree that she did not want to share his love—hence her objection to his marriage. One witness who had been in the employ of Mrs. Ambruster for many years described testatrix as a person who wanted "to possess you body and soul." That she was of a domineering nature is evidenced by the fact that she totally ignored the decree of this court in the above-case as to the interest her son had in the William Ambruster Corporation.

There is no evidence in this case that the testatrix brooded to an unusual extent over her husband's death. We do not mean this as any reflection upon Mrs. Ambruster. The evidence justifies the statement that she accepted this unfortunate event in her life with courage and bravery. She carried on the business her husband had established and otherwise made herself a useful, active, and good citizen.

With the above background of the life of Mrs. Ambruster, leading up to the years 1945 and 1946, we come to the evidence on the question of whether she was of sound mind on September 29, 1948. She was 74 ▮▮ years old in 1946. Many witnesses testified that in 1945 and 1946 a change was noticed in the attitude of Mrs. Ambruster toward things in general. Mrs. Ambruster was a heavy woman; she suffered with arthritis, and used a cane to aid her in getting about. A maid who had been in her employ for a number of years testified that Mrs. Ambruster threatened to commit suicide a number of times; that on two occasions she attempted to commit suicide by inhaling gas fumes; that on one occasion she found her leaning over the gas stove with all

of the burners on but not lighted and papers so arranged that she could inhale the fumes.

On one occasion in 1947 she told Hamilton that there was no purpose in living any longer; that she had been to the cemetery where her husband was buried and she wished someone would come along and end her life so she could be with her husband.

The maid above referred to also testified that at times the testatrix would drink to excess; that the maid was requested to prepare the drinks. In June, 1946, while testatrix was at her home which was on the upper floor in the funeral home on Lindell Avenue, she became in such a condition that a Dr. E. J. Lee was called. Dr. Lee advised that she be taken to Missouri Baptist Hospital. It is in evidence that Mrs. Ambruster refused to go, created quite a disturbance, and called for her son. When her son arrived, she was taken by ambulance to the hospital. Her condition was diagnosed as "Korsakoff's syndrome." Dr. Arthur H. Deppe, specialist in neuro-psychiatry, gave the following report on her when she was in Missouri Baptist Hospital: "Very irritable. Suspicious. Leading one to believe she is entertaining paranoid ideas." "From the history, patient has apparently been a paranoid type for years. Barbital habituation." The doctor also found that Mrs. Ambruster was senile and mentally disturbed. Mrs. Ambruster was at the hospital a few weeks and returned to her home and continued to conduct her business.

The record shows that Mrs. Ambruster during the latter part of 1946 and the early part of 1947 was less attentive to business. On several occasions she turned out the lights in the funeral home before closing time and informed those present it was time to go home. The evidence showed that testatrix listened constantly to radio programs and she insisted that people were talking about her on the radio and that a secret code was being used; that she spent much time in attempting to decipher the code. There is also evidence that beginning in 1947 the testatrix often spoke of the F.B.I.; that she was being followed by its agents.

In July, 1947, Mrs. Ambruster called Judge Hamilton and informed him that she had been offered $75,000 for her Lindell Avenue property, the "funeral home," and asked his advice about selling it. Judge Hamilton advised her not to sign the contract. A few hours later she called and informed him that she had signed the contract. After the deed had been executed and delivered to the purchaser, Mrs. Ambruster called Hamilton and instructed him not to deliver the deed. When she learned the deed had been delivered, she became very disturbed and said she had been robbed. Plaintiff testified that he did not know of the sale and that he had a standing offer for the property at $125,000. Mrs. Ambruster, however, did not know that such an offer had been made. Mrs. Ambruster was by the sales contract given 30 days to vacate. She called on her son to dispose

of the personal property and equipment. Some dispute arose and plaintiff insisted that his mother give him written authority. This she refused to do until she conferred with Judge Hamilton. Plaintiff was about to go on a vacation and spent a number of days before leaving in disposing of the equipment and arranging a place for his mother to live. It was while plaintiff was on this vacation that he received a number of letters from his mother. The tone of the letters · indicated she had a kindly feeling for him. In October, 1947, Mrs. Ambruster was taken to McMillan Hospital and placed in a ward for mental patients. The evidence is that ▉▉▉ testatrix at . times created quite a disturbance at this hospital. Dr. Archie D. Carr, a neurologist, treated testatrix from October 18 to December 19, 1947; he testified that in his opinion testatrix was of unsound mind. Note a portion of his evidence:

"Q. Did you observe or ascertain whether she was afflicted or bothered with any delusions of any kind?

"A. Well, she frequently expressed ideas that people were against her, that I had done something or the nurses had done something, or some other patients had done something, was almost a daily occurrence.

"Q. And what did you characterize that as?

"A. Well, she certainly had ideas of persecution that we were doing these things.

"Q. I notice on your hospital report, you called it paranoid type. That is what I'm getting at, Doctor.

"A. Oh, I see. Well, that would fit in, anyone has ideas of reference or persecution is paranoid. I don't think that is essential, though."

\* \* \* \* \* \*

"Q. (By Mr. Cox, Sr.) Now, you may. answer as to whether you think, taking into consideration those records, pathological report as I have indicated, whether or not she was of sound or unsound mind on the 29th day of September, 1948?

"A. In view of what I know of her, she was not.

"Q. She was not of sound mind; is that right?

"A. Yes, sir.

"Q. Doctor, was her condition a progressive condition?

"A. Yes, sir.

"Q. Tell us why and explain that, will you?

"A. Well, her age was one factor. As she got older, she became more feeble and the changes were progressive. The blood pressure persisting for greater period of time. The changes in the arteries increasing, with necessary deteriorations in the body, various organs of the body, including the brain."

While testatrix was at the McMillan Hospital she developed a bitter feeling toward her son. She accused him of being responsible for her confinement. This ill feeling for plaintiff continued during the remainder of her life. Mrs. Ambruster was very much dissatisfied at the McMillan Hospital and plaintiff and Judge Hamilton looked for some other place. They selected Edgewood Retreat as a proper place for her and she was taken there on December 20, 1947.

Dr. Robert C. McElvain treated her at this institution. He testified that testatrix had a persecution complex; that the mention of her son would upset her very much. Note a portion of his testimony:

"Q. Having in mind the delusions with reference to the persecution complex, what would you say about that?

"A. Well, those are not normal at all; those are unnatural, and they are indicative of some degree of mental instability.

"Q. Were her delusions of the type that control her feelings?

"A. I think that, I think that her delusions, while she suffered with them, took complete control of everything pertaining to her thinking and reasoning.

"Q. And did those delusions take charge of her every time, for instance, you mentioned her son, or being in the hospital there?

"A. Yes, I would say they did."

He further testified that Mrs. Ambruster told him she was being persecuted by the government, by her son, and by the institution in which she was confined; in his opinion those ideas of hers were delusions.

In January, 1948, while testatrix was at Edgewood Retreat, she left by taxi and went to a home on Manchester Avenue where she stayed a few days. Dr. McElvain testified he was called there one evening about nine o'clock and found Mrs. Ambruster quite noisy and very unreasonable; that he gave her a hypodermic to quiet her. Later she was taken back to the Edgewood Retreat where she remained until March 1, 1948.

While testatrix lived at Edgewood Retreat, she came to the conclusion that Judge Hamilton was agreeing with her son and had aided him in having her confined against her will. It is in evidence that she became very suspicious of the Judge. She wrote letters to Jacob M. Lashly who had represented her in litigations. See ▇▇▇ Ambruster v. Ambruster, supra, and Fisher v. Myers, 339 Mo. 1196, 100 S. W. (2d) 551.

After March 1, testatrix moved into an apartment (owned by Ruth Fleming Hollocher) at 7124 Forsyth Boulevard and there she lived with Ruth Fleming Hollocher with whom she had lived on several occasions. After Mrs. Ambruster had moved to this Forsyth apartment, Mr. Lashly called upon her. She requested him to file suit against her son and Judge Hamilton for an accounting and for

possession of her property. Mr. Lashly declined because of pressing business of his own and that he did not desire to enter any further litigation between Mrs. Ambruster and her son. She next contacted Frank E. Morris and after some consultation between Morris and the testatrix, Morris declined to represent her. In fact, Mrs. Ambruster was very hesitant about employing Morris because of his religion. Mr. Lashly recommended Arnold Willmann to Mrs. Ambruster. Willmann was employed. This was in May, 1948. Mrs. Ambruster notified Judge Hamilton that she no longer considered him as her legal advisor. Previous to this Mrs. Ambruster had demanded that plaintiff and Judge Hamilton turn over to her what property of hers they had in their possession. Hamilton did have in his possession the money testatrix had received for the Lindell Avenue property; this she had turned over to the Judge for safe keeping. Plaintiff had possession of a car and some other personal property that he had obtained while attending to his mother's business when she sold the Lindell Avenue property and while she was in the various institutions. Neither Judge Hamilton nor plaintiff denied or disputed Mrs. Ambruster's title to the property. They refused to turn over the property to Mrs. Ambruster or to Willmann because they deemed her not capable of taking care of it and for that reason retained possession. Mrs. Ambruster demanded the property stating that she wanted to take care of her business and property. In June, 1948, Willmann filed suit for testatrix against Judge Hamilton and plaintiff. That case was never tried. Much of the property was turned over to Mr. Willmann; some before the suit was filed and other after the suit was filed.

There is no evidence that Mrs. Ambruster ever took possession of this property or that she conducted her own business. In fact, a safe deposit box was rented to which Mr. Willmann had a key and he and no one else had a right to open the box. Mr. Willmann was a witness for the proponents and he testified that when he had his first conference with Mrs. Ambruster, Mr. Lashly was present. Note his evidence as to his first impression of Mrs. Ambruster:

"Q. How long were you and Mr. Lashly there in conference with Mrs. Ambruster?

"A. Oh, I would judge about an hour and a half, maybe, a little less, maybe a little more.

"Q. And when you left the premises, after you took your leave of Mrs. Ambruster, state what happened.

"A. Of course, I stood out on the sidewalk talking to Mr. Lashly about the things she had said, that seemed rather fantastic at the time. I didn't think things like that would happen in this day and age, * * *."

Previous to the time that testatrix employed Willmann, plaintiff had attended to the task of engaging nurses to take care of his mother. He

also attended to the matter of having the various apartments where she was to live conditioned so as to be suitable for her comfort. Plaintiff obtained reports of his mother's progress from the nurses and he kept close watch over her. This greatly angered testatrix; she claimed he was spying on her and keeping her in the various institutions and apartments as a prisoner.

On May 29, 1948, Mrs. Ambruster moved to her property referred to as a farm, a ten-acre tract on Kropp Road in St. Louis County, where she remained until September 20, 1948. She then moved to one of her apartments at 1024 South Kingshighway. While testatrix lived on the farm, she was taken care of by a nurse, Mrs. Bayly, until about June 15. Thereafter Mrs. Myrtle Lake, one of the defendants, who lived on the farm took care of Mrs. Ambruster. The record includes an abundance of evidence that while Mrs. Ambruster was in the various institutions, she often created disturbances and the nurses had difficulty in controlling her. There is a great deal of evidence in the record that while she lived at the apartments she was under the impression that people were talking about her on the radio; that a number of programs were devoted to her and that Drew Pearson devoted an entire program to discussing Mrs. Ambruster. When in May, 1948, she was taken to the farm, she was under the impression that an agent of the F.B.I. was following her.

The proponents of the will contend that when Mrs. Ambruster arrived at the farm she was contented and entirely normal. Mrs. Lake testified that she took care of Mrs. Ambruster and had no trouble with her. The substance of this witness' testimony as to Mrs. Ambruster while at the farm is embraced in the following question and answer:

"Q. And how about the times that she was at the farm?

"A. She was always just fine, just like she had, I had always known her. I had never seen her any other way; she was always just fine."

On cross-examination she was asked about a letter she had written on August 20, 1948, to Susie Cameron, while Mrs. Ambruster was staying at the farm. The witness admitted writing the letter. A portion thereof reads as follows:

"Dear Susie & Will,

"How are both of you, I am sending you a picture that was in the paper of Ruth, maybe she has already sent it to you, Mrs. Ambruster wanted me to send it to you, my Sue I wish I could just talk to you, you will never know what I have been through with Mrs. A. I am almost ready for the hospital, the doctor said I was on the verge of a nervous breakdown, about 2 weeks ago she just talked to me terrible told Rolla & I to get out, I called Mr. Willman & talked to him & he called her & talked to her, we are looking for a place, I would rather be in one tiny

room than to take what I have from her, she don't want little Buddy to come see me I could never tell you in a letter but Sue she is mean I don't know what it is but you can hardly live with her.''

We learn from the evidence that after Mr. Willmann was employed, he was asked to do about the same things for Mrs. Ambruster that plaintiff and Judge Hamilton had been doing. Mr. Willmann often conferred with Mrs. Ambruster. She visited his office in the company of a nurse or an attendant about once a week. She called him frequently over the telephone and was constantly inquiring about her lawsuit against Hamilton and her son. She was wanting the case to be tried. Mrs. Lake made frequent reports to Mr. Willmann as to Mrs. Ambruster's condition.

After September 20, 1948, testatrix lived at the Kingshighway apartment. She conferred with Willmann about writing a will. On September 29 of that same year, she was taken to Willmann's office where she executed the will in question.

Many lay witnesses testified for proponents of the will. They testified that in their opinion Mrs. Ambruster was of sound mind; that she knew what property she owned; that she knew all her relations; and that she talked and acted rationally. Many lay witnesses testified for the contestants that in their opinion Mrs. Ambruster was of unsound mind.

After the will was executed and about November, 1948, testatrix, so all witnesses agreed, became confused about many things. On November 11, Willmann was called and after some consultation with interested parties, Mrs. Ambruster was taken to St. Vincent's Sanitarium where she remained until her death on June 3, 1949. She was declared to be of unsound mind by the Probate Court on December 6, 1948, and plaintiff was appointed her guardian.

It is appellants' contention that even though Mrs. Ambruster may have at times been of unsound mind, especially while she was confined in the various institutions, she had lucid intervals. It is argued that despite all of the evidence contestants introduced as to her unsoundness of mind, there is no evidence to support the conclusion that testatrix did not have testamentary capacity on September 29, 1948. The governing rule was stated by this court en banc in Smith v. Fitzjohn, 354 Mo. 137, 188 S. W. (2d) 832, 1. c. 833, 834 (3, 4) as follows: ''There can be no submissible issue of testamentary incapacity without some evidence of such incapacity *at the time* the will was executed. Evidence, not too remote, of mental unsoundness either before or after the will's execution is admissible, provided it indicates that such unsoundness existed at the time the will was made. Schoenhoff v. Haering, 327 Mo. 837, 38 S. W. (2d) 1011; Whitacre v. Kelly, 345 Mo. 489, 134 S. W. (2d) 121; Hennings v. Hallar, 347 Mo. 827, 149 S. W. (2d) 338; Von de Veld v. Judy,

143 Mo. 348, 44 S. W. 1117.'' Aside from all of the evidence as to the unsoundness of mind on part of Mrs. Ambruster both before and after the execution of the will, we find evidence in the record that she was of unsound mind on September 29, 1948, the day the will was executed. Dr. Arthur H. Deppe waited upon Mrs. Ambruster on various occasions and last saw her in January, 1948. His evidence as to her condition on September 29, 1948, was as follows:

''Q. Do you have an opinion as to whether or not this woman on - - first, I will ask you: do you have an opinion as to what her mental condition was generally?

''A. I have an opinion as to what her mental condition was in December, '47, and January, '48.

''Q. All right, what was it? .

''A. She was insane.

''Q. She was insane?

''A. Yes.

''Q. Any particular type of insanity?

''A. Called a paranoid state and beginning senile psychosis.''

\* \* \* \* \*

''Q. And in your opinion, Doctor, would this woman be free from her delusions and paranoid state, say, in September, 1948, particularly September the 29th, 1948, so as to enable her to make a will?

''A. From what I saw of Mrs. Ambruster, I thought, it is my opinion she had a progressive type of dementia.

''Q. Progressive?

''A. And I don't think - - it was my opinion, therefore, she wouldn't be normal at that particular date you just mentioned.''

Dr. Francis M. Barnes, Jr., a psychiatrist, examined Mrs. Ambruster at various times. This witness had informed Mr. Willmann that in his opinion Mrs. Ambruster was capable of filing a suit for an accounting. His evidence at the trial was in part as follows:

''Q. Well, Doctor, would you say that the paranoid state would clear up and disappear, or would it remain constant, or grow worse?

''A. I would say no, on the basis of such information as I have since obtained since 1948, with complete access to the McMillan Hospital record, to the Edgewood Retreat record, to the pathological report and the autopsy, and to the St. Vincent's Hospital record, I would not consider any possibility of those paranoid trends disappearing.

''Q. So, in your opinion, they were present on September 29, 1948?

''A. I think unquestionably so.

''Q. And would be controlling as to her?

''A. Of course, they would control her.''

On recross-examination, he testified as follows:

"Q. You told John Nolan and Arnold Willmann that, in your opinion, in May of 1948, that you thought she was competent to conduct an accounting, a lawsuit for an accounting against Judge Hamilton and her son?

"A. Absolutely; I think she was. I don't think it requires a great deal of mentality in my opinion.

"Q. Oh, you don't?

"A. No. She doesn't conduct the case.

"Q. And you now tell this jury that in September of 1948 she was not competent to write a will?

"A. I don't think she was competent to write a will when I saw her in May of 1948."

We are of the opinion that we have quoted sufficient evidence to show that a jury was justified in finding that Mrs. Ambruster was not competent to execute a will on September 29, 1948.

In the brief and in oral argument appellants insist that Mrs. Ambruster and her son were not friendly for many years. It is true that Mrs. Ambruster resented very much that her son had by legal proceedings established his rights in the William Ambruster Corporation; also that she objected to his marriage. That, however, as we conclude, was a peculiar characteristic of Mrs. Ambruster. She wanted to be the absolute ruler of the William Ambruster Corporation and desired to have full control of her son. The evidence is conclusive, however, that Mrs. Ambruster had no idea of disinheriting her son for any of the things she thought he had done wrong. On June 5, 1943, Mrs. Ambruster executed a will, and on March 5, 1945, she executed another. In each will she devised a large portion of her estate in trust, the income to be paid to plaintiff, her son. After the death of her son, the property was to vest absolutely in the daughter of plaintiff or her descendants. Judge Hamilton was named as one of the trustees and as co-executor. The wills provided that in case Judge Hamilton could not act, then her son, the plaintiff, should act as co-trustee and as co-executor. We may add the record shows that Judge Hamilton through all of the years while representing Mrs. Ambruster was loyal to her and always took care of her interests. The record contains no evidence that justified Mrs. Ambruster's suspicions of Judge Hamilton. It is no wonder that Mr. Willmann's first impression of the story told him by Mrs. Ambruster was that it was "fantastic." The jury that tried this case and heard all of the evidence was probably of the same opinion. A jury was justified in finding that Mrs. Ambruster had a paranoid condition. The doctors who testified on the subject all agreed that paranoia is a progressive disease. This is supported by Webster's New International Dictionary, 2nd. Ed.; 44 C. J. S. 41,

Sec. 2, Paranoia; Ex Parte McManus, 146 P. (2d) 948. We hold that the verdict was supported by ample and substantial evidence.

Appellants contend the trial court erred in refusing to give their instruction withdrawing from the jury the question of insane delusions. The second paragraph of the instruction reads in part as follows: "In this connection you are instructed as a matter of law that the evidence is insufficient to prove that Edith E. Ambruster was suffering from an insane delusion or insane delusions at the time of execution of the paper writing offered in evidence as her will, * * *." The evidence we have heretofore related was ample for a jury to find that at the time the will was executed, testatrix was possessed of a persecution complex, that is, insane delusions; that her paranoia controlled her actions; that paranoia is a chronic, progressive disease. The witnesses who were medical experts all so testified. The appellants say that even though there was substantial evidence to support a finding of insane delusions, the instruction, nevertheless, should have been given because contestants abandoned that issue. The portion of the instruction which we quoted wherein it was stated that "you are instructed as a matter of law that the evidence is insufficient to prove that Edith E. Ambruster was suffering from an insane delusion" was incorrect and if the instruction had been given, it would have been a misdirection. The case of Yuronis v. Wells, 322 Mo. 1039, 17 S. W. (2d) 518, 521 (1-3), and similar cases cited by appellants are not in point. In fact, contestants did not abandon but relied upon the evidence as to insane delusions. By their instruction the issue of mental capacity on the part of Mrs. Ambruster was submitted to a jury. Insane delusions and paranoia are but a form of insanity. In 44 C. J. S. 41, Sec. 2, Paranoia, we read: "A term used to designate the form of insanity characterized by systematized delusions; and which may be defined as chronic mental unsoundness of a progressive character, accompanied or characterized by delusions; a form of mental distress known as delusional insanity and progressive insanity." The trial court properly refused the instruction. Norton v. Johnson, 359 Mo. 1214, 226 S. W. (2d) 689, l. c. 710 (12).

While Dr. James F. McFadden, a specialist in nervous and mental diseases, was on the witness stand relating the symptoms of paranoia, the attorney for contestants asked if it was characteristic of such patients to try to sue the people who placed them in an institution. Objection was made that the question was leading. The attorney then asked, "All right; is that one of the manifestations?" The doctor answered in the affirmative and stated that in that regard he had had personal experiences of a patient suing him for that reason. Objection was made to the witness' relating any specific instance. The court overruled the objection provided that in the instance referred to the patient was afflicted with paranoia.

The doctor answered that the patient did have a paranoid condition. The court then stated the subject matter should not be further pursued. The record shows that Mrs. Ambruster threatened to sue the McMillan Hospital wherein she was confined. The trial court did not err in its ruling. See 32 C. J. S. 442, Sec. 589.

Appellants say that in the hypothetical questions, facts not shown by the record were incorporated. We shall consider a few of these to show the contention to be without merit. The first statement objected to as found in appellants' argument is "that she became friendly with her son." Appellants say testatrix and her son were on the "outs" for years dating back to the lawsuit decided in 1930. There is evidence that Mrs. Ambruster was friendly to her son. Her letters to him during the summer of 1947 when plaintiff was on his vacation were of a friendly nature. Testatrix began her letters with "Dear Robert" and signed the letters "Your Mom" or "Love Mom." We found other evidence in the record that Mrs. Ambruster was very friendly toward her son. The fact that in her wills of 1943 and 1945 she had trusted her son sufficiently to name him, if Judge Hamilton could not serve, as co-trustee and co-executor without bond, was evidence that she was not on the "outs" with plaintiff.

Again appellants say that in the hypothetical questions, it was stated that testatrix "was raving, irrational, incoherent, * * * untidy, disoriented"; that these were conclusions and not based on facts in evidence. We found evidence in the record to sustain all of these and more. There was evidence that testatrix at times screamed for no apparent reason, threw objects at the nurses, attempted to strike people with her cane, and became very untidy. A number of doctors stated they found her disoriented. Note the evidence of Dr. William B. Lytton, psychiatrist, as to her conduct during his examination of March 8, 1948, when he called on her. "Well, I made it (examination) at the apartment on Forsyth. She was there at the time, and had special nurses in attendance. The nurse let me in, brought me back to her sitting room or bedroom, and introduced me to her, and she started to rave and holler at me, and told me to get out, said that people were trying to kidnap her again, and she didn't need a doctor, that she was perfectly all right; asked her how she felt. She said she felt fine, she didn't need a doctor, wasn't anything wrong with her. She ordered me out of the house and threatened me with her cane; got pretty noisy."

Objection was made to the inclusion in the hypothetical questions that testatrix in December, 1948, after the execution of the will, had been declared of unsound mind. This objection was based on the fact that the judgment had been rendered by the probate court while testatrix was confined in St. Vincent's Sanitarium and could not defend herself. That would not be a valid objection. Then, too,

we must not forget that at this time Mr. Willmann was her lawyer and it was Mr. Willmann who was at least partially responsible for having Mrs. Ambruster sent to the sanitarium.

We find that the trial court gave appellants full opportunity to object to the hypothetical questions and add thereto any facts supported by the record. The trial court sustained a number of the objections made and incorporated other facts suggested by appellants. On one occasion, when a hypothetical question was being asked, counsel for appellants made a number of suggestions, then added: "I don't guarantee that that is all of them, because frankly it is too lengthy for me. Those are just some of the things that occur to me."

It is evident the trial court closely guarded the hypothetical questions and we fail to discover any error as contended for by the appellants. Evans v. Partlow, 322 Mo. 11, 16 S. W. (2d) 212, l. c. 217, 218 (7); Colburn v. Krenning, Mo., 220 S. W. 934, 941 (9); 32 C. J. S. Secs. 551, 552, pp. 347 to 361. We may add that the trial of this case lasted about a month and the record discloses the trial judge was extremely patient and tried the case very carefully.

The verdict of the jury was supported by substantial, in fact an abundance of, evidence. We have found no reversible error on the points briefed and the judgment is hereby affirmed. *Bohling* and *Barrett, CC.,* concur.

PER CURIAM:—The foregoing opinion by Westhues, C., is adopted as the opinion of the court. All the judges concur.